LEROY H. SCHEIDELMAN and HAZEL D. SCHEIDELMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scheidelman v. Commissioner
Docket No. 1867-72.
United States Tax Court
T.C. Memo 1975-227; 1975 Tax Ct. Memo LEXIS 143; 34 T.C.M. (CCH) 993; T.C.M. (RIA) 750227; July 14, 1975, Filed *143 Richard O'C. Kehoe, for the petitioners. George W. Connelly, Jr., for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following deficiencies in petitioners' Federal income taxes: TYE
Deficiency
12/31/65
$ 3,441.27
12/31/66
6,670.43
12/31/67
18,749.08 Both parties having made concessions, the only issue left for our decision are the values for charitable deduction purposes of certain properties contributed by petitioners in 1965 to an exempt organization. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Leroy H. and Hazel D. Scheidelman (petitioners) are husband and wife who resided in Old Forge, New York, at the time the petition herein was filed. They filed joint Federal income tax returns for their 1965, 1966, and 1967 taxable years with the District Director of Internal Revenue, Buffalo, New York. On October 28, 1943, petitioners purchased two pieces of property for $8,000 from the Jay R. Monroe Corporation (Monroe). One was an island called Dark Island located on Brantingham Lake, New York. The island was about four acres in area, *144 and fronted for approximately 1,600 feet, at the high water mark, on Brantingham Lake. The island was conveyed together with-- all of the right, title and interest of the party of the first part, if any, of, in and to ALL that strip or belt of land under the waters of Brantingham Lake, adjoining and surrounding said Island, said strip or belt of land being twenty-five (25) feet wide at all points, measured horizontally at right angles from the low water mark, around said Island, subject, however, to the right of the public to navigate the waters covering said strip or belt where not taken up by boat house docks or other structures appurtenant to said premises. The record is silent, however, as to whether Monroe actually had any rights to convey in the above-described strip of underwater land. The second piece of property sold to petitioners by Monroe was a lake-front lot (Lot 135) located on the north shore of Brantingham Lake. Lot 135 fronted for 75 feet on the lake, and its other 3 sides measured 187.8 feet, 314.6 feet and 242 feet. At the rear of the lot was a private road which provided access from the surrounding area. Included in the sale to petitioners were the rights *145 of ingress and egress over such private road. In each of the years 1962 and 1963, petitioners transferred by gift a one-half interest in a single portion of Dark Island to the Marianists of Ohio, Inc. (Marianists), a charitable organization. The property conveyed, which included a cottage thereon, fronted for 100 feet along Brantingham Lake, was 105 feet in depth, and 64 feet in width across the rear lot line. Also conveyed, by language similar to that utilized by Monroe in the 1943 sale, were any rights petitioners might possess in the 25-foot wide strip of underwater land, as measured from the low-water mark. Petitioners claimed deductions for these charitable gifts on their 1962 and 1963 Federal income tax returns. The correct valuation of these gifts was one of the issues involved in a trial before this Court, Leroy H. Scheidelman,T.C. Memo. 1970-70. We there found the cottage and land to be worth $21,400 at the times of the gifts, of which $4,000 was allocated to the land. The respondent did not contest the land valuation in that proceeding. In 1964, petitioners transferred two further pieces of property on Dark Island to the Marianists. One piece, which *146 contained a cottage, fronted for 100 feet along Brantingham Lake and was 100 feet in depth, the other was a triangular-shaped piece of property, containing a recreational building and fronting for approximately 200 feet on the lake. On their 1964 Federal income tax return, petitioners claimed a charitable deduction of $37,939.10 for the two portions of Dark Island contributed to the Marianists. Their return for that year was accepted as filed. In 1965, petitioners, in two separate conveyances, made gifts to the Marianists of their remaining interests in Dark Island consisting of approximately 1200 feet of frontage on the lake, as measured at the high-water mark, and of all their interest in Lot 135. Included in the Dark Island deed was the "right title and interest of * * * [petitioners'], if any, of, in and to the 25-foot wide strip of underwater land, as measured from the low-water mark, which was appurtenant to the lake frontage conveyed. Certain improvements located on the part of Dark Island contributed in 1965 were conveyed together with the island property itself. The 1965 reproduction costs of these improvements are stipulated as follows: Improvement
Reproduction Cost
Cottage
$11,306
Guesthouse
26,521
Boathouse
2,266
Observation Deck
3,117
*147 In 1965, the highest and best use of both Dark Island and Lot 135 (both located in the upstate Adirondack mountain region of New York) was as recreational lakefront sites. Neither of the properties was then subject to any zoning restrictions. The properties were primarily wooded, and the facilities and homes located in the area of the properties conveyed were of a seasonal type. On October 13, 1972, the Marianists sold Dark Island and Lot 135 to John J. Droz, Jr., the petitioners' grandson, for $45,000. On their 1965 return, petitioners claimed the following amounts as charitable contributions to the Marianists during that year: Lot 135
$ 7,260.00
Dark Island (land)
61,120.00
Cottage
9,601.00
Guesthouse
22,543.00
Boathouse
1,926.00
Observation Deck
2,649.00
Log Cabin and Playhouse
600.00
Miscellaneous Items on
Lake
3,464.40 Respondent, in his statutory notice, determined that the values of the items contributed were, instead, as follows: Lot 135
$ 1,600.00
Dark Island
22,000.00
Cottage
5,653.00
Guesthouse
13,261.00
Bathhouse [sic] [1]
1,133.00
Observation Deck
1,559.00
He allowed no deduction *148 for the items listed as "log cabin and playhouse" and as "miscellaneous items on lake" above. At trial, it became apparent that respondent had in effect determined that no such items had been transferred to the Marianists by the petitioners in 1965. On brief, respondent conceded a higher valuation as to Lot 135 and the land portion of Dark Island as follows: Lot 135
$ 2,925.00
Dark Island (land)
25,700.00
OPINION In 1965, petitioners contributed certain properties to a charitable organization. Respondent does not dispute that petitioners are entitled to a charitable deduction in the amount of the fair market values of such properties, which is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. It is the fair market values of the properties conveyed which remain in dispute. Turning first to Lot 135, located on Brantingham Lake, each party introduced expert witnesses to support the position they had taken as to the site's value. Reviewing their testimony, we have found only *149 the evidence introduced as to comparable sales to be of material assistance. These sales, which took place in August of 1966, involved plots of land located on the south shore of Brantingham Lake, an area quite similar in geography and development to the lake's north shore, where Lot 135 was located. While the lots were, on the average, about one-half acre smaller than Lot 135, they contained substantially more frontage along the lakes, and had been zoned, unlike Lot 135, along the following lines: Each lot to be used for residential purposes only. No commercial enterprise except rentals. Each lot limited to one (1) house or cottage, plus boat house on water's edge. No lot to be sub-divided. Temporary housing units to be allowed for time to construct permanent improvements only. Housing shall conform to existing and adjoining housing, requiring complete external finish, no tar-paper roofs or siding. No noxious or offensive activities. These sales had been conducted through an auction--although no evidence was introduced to help us determine precisely how this factor would influence the sales price--and the prices ranged from $29.75 per front foot for one of the lots, *150 to $39.75 per front foot for another. Being very cognizant of the sparse record upon which we must decide this issue, we hold that, on the basis of the entire record, that $41 per front foot is the appropriate measure of the fair market value of Lot 135. Thus, we hold that the fair market value of Lot 135 was $3075. As to Dark Island itself, the record was again rather bare of evidence to assist us on the valuation issue. Experts for both parties agreed that the value per front foot of the island should be less than that for Lot 135. Reasons given included the greater difficulty of developing the island property, and the increased problem of access. Reviewing the record, it is clear that the major dispute of the parties centered about, not what front-foot value should be placed on the island, but rather the actual amount of front footage which was conveyed to the Marianists in 1965. We have found above that 1200 feet of front footage, as measured at the high-water mark, was so conveyed, and, agreeing with the pretrial reports of experts for both parties, find a value of $35 per front foot for Dark Island. Hence, we hold that the value of the portion of Dark Island conveyed to the *151 Marianists in 1965 was $42,000. Petitioners argue that they conveyed to the Marianists substantially more than 1200 feet of lake-front property on Dark Island. This position, however, is based on their contention that the 1965 conveyance to the Marianists included a 25-foot wide strip of underwater land as measured from the low-water mark around the island. Thus, according to petitioners, the front footage conveyed should be measured not along the high-water mark but along the line formed by the outer edge of such 25-foot wide strip. Petitioners, however, introduced no evidence that such 25-foot strip was ever owned by Monroe, from whom petitioners had purchased Dark Island in 1943. As we noted above in the findings of fact, Monroe conveyed only "all of the right, title and interest of the party of the first part, if any," to such underwater property. Petitioners have failed to prove what title--if any--Monroe had to such property, consequently we have not taken such underwater strip into account in determining the correct front footage for valuation purposes. Coming finally to the value of the improvements on Dark Island which were conveyed to the Marianists, petitioners have *152 introduced no evidence to overcome the presumptive correctness of respondent's notice of deficiency. We therefore uphold respondent's determinations of value, as contained in the statutory notice, as to the cottage, guesthouse, boat-house and observation deck. Furthermore, again because of petitioners' failure of proof, we uphold his determination that these were the only improvements actually conveyed to the Marianists in 1965. On brief, respondent contended for somewhat lower valuations than those contained in the statutory notice as to the four improvements mentioned above. However, as to such lower values, respondent must carry the burden of proof, a task respondent has not accomplished. Hence, we uphold respondent's determination of value only as set forth in his statutory notice of deficiency. In deciding the above valuation questions, we have been aware that in 1972, seven years after the conveyances before us, the Marianists sold Dark Island and Lot 135 to petitioners' grandson for $45,000. However, neither party produced any evidence as to the condition of the properties in 1972, or as to any circumstances surrounding such sale. Indeed, neither party discussed this sale *153 at all, either during the trial or on brief and consequently we have accorded it less weight than it might have merited on a fuller record. Decision will be entered under Rule 155.
Footnotes
1. Refers to Boathouse.↩